## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PRESTINE BUSH, | ) | |
| | ) | |
| | ) | 2:19-cv-01004-NR |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COMCAST CABLE | ) | |
| COMMUNICATIONS | ) | |
| MANAGEMENT, LLC, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## **OPINION**

**J. Nicholas Ranjan, United States District Judge**

Comcast requires its employees to accept the terms of a dispute-resolution program, known as "Comcast Solutions," as a condition of their employment. One of those terms is a mutually binding arbitration provision. Here, Comcast seeks to enforce that provision against Prestine Bush, a former employee, who has asserted claims against Comcast for violating the ADA, Title VII, and the PHRA. Ms. Bush seeks to avoid arbitration on three grounds. First, she claims that the Comcast Solutions program is unconscionable. Second, she argues that she never accepted the terms of Comcast Solutions. And, third, she contends that the arbitration agreement is void because Comcast materially breached its own obligations under the Comcast Solutions program. The Court disagrees, and will grant Comcast's motion.

First, the arbitration agreement is not unconscionable. Ms. Bush's contrary argument rests on the sort of "generalized attacks on arbitration" that the Supreme Court has rejected. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30 (1991). Based on the evidence submitted to the Court, the Comcast

Solutions program does not circumscribe Ms. Bush's rights or remedies under federal law.  To the contrary, it provides for a neutral forum in which Ms. Bush may obtain the same money damages, attorneys' fees, and equitable relief that would be available through a court.  Comcast will even pay for the arbitration and reimburse up to $1,500.00 in attorneys' fees.  If other unfair provisions exist, then Ms. Bush has not brought them to the Court's attention.

Second, Ms. Bush's own deposition testimony defeats her claim that she did not accept the terms of the Comcast Solutions program.  Ms. Bush first submitted a declaration denying that she accepted any such agreement, but then, when the Court authorized limited discovery, testified that she had received Comcast's offer letter and had "no reason to dispute" that she accepted its relevant employment terms, including the Comcast Solutions program, or that she  had twice acknowledged being bound by Comcast Solutions after that.  To the extent Ms. Bush still relies on her earlier declaration to suggest otherwise, her subsequent deposition testimony controls.

Third, Comcast did not materially breach the arbitration agreement.  Ms. Bush's theory is that Comcast refused to arbitrate her claims when she demanded it do so while she was still employed, and so it cannot force her to arbitrate those claims now.  But discovery has shown that Ms. Bush did not demand to mediate or arbitrate any claim she might have against Comcast.  Rather, she asked Comcast's Human Resources department, through the separate "Comcast Listens" program, to facilitate a discussion between herself and the employees she alleged were harassing her, and to investigate or take action to address that harassment.

To be sure, the Court is skeptical of the formalistic wall Comcast tries to erect between the "Comcast Listens" and "Comcast Solutions" programs.  If an employee erroneously demanded to arbitrate a legal claim against Comcast

through the "Listens" program, instead of the "Solutions" program, it would probably be on Comcast to refer the claim to the right place. But Ms. Bush never made such a demand—there is no evidence that she ever expressed to Comcast, whether formally or otherwise, an intent to assert any legal claim against the company at all. Thus, because a mere request for help resolving harassment by co-workers did not trigger Comcast's duty to arbitrate under the Comcast Solutions program, Comcast did not breach any contractual duty by "failing" to arbitrate.

For these reasons, the Court will grant Comcast's motion, compel Ms. Bush's claims to binding arbitration, and dismiss this case with prejudice.

## BACKGROUND

### I. Ms. Bush's employment with Comcast, and allegations of harassment following sexual assault by a co-worker.

Ms. Bush began working for Comcast as a customer service representative on January 31, 2017. [ECF 1, ¶ 9]. She alleges that Comcast had a "gossipy and unruly work culture" and that "[i]n April 2017, rumors began to spread that [she] was in a relationship with Imani Bowen, another customer service representative." [*Id.* at ¶ 10]. As a result of this rumor mill, she was "constantly subjected to questions and inappropriate comments from her co-workers." [*Id.* at ¶ 11]. Then, in August 2017, Mr. Bowen sexually assaulted Ms. Bush at her home. [*Id.* at ¶ 17]. He was arrested and criminally charged with (1) rape; (2) various sexual assault crimes; (3) burglary; (4) assault; and (5) resisting arrest. [*Id.* at ¶ 18]. He ultimately pled guilty to one count of sexual assault and was sentenced to prison and lifetime sex-offender registration. [*Id.* at ¶ 22].

Following the sexual assault, Ms. Bush alleges that she faced repeated, harassing inquiries at work about Mr. Bowen and the criminal charges. [*Id.*

at ¶ 25]. This harassment aggravated Ms. Bush's PTSD, anxiety, and depression, leading her to request FMLA leave. [*Id.* at ¶ 26]. Despite her reports, Comcast allegedly failed to address the harassment, thereby "forcing" Ms. Bush to leave work on June 9, 2018. [*Id.* at ¶¶ 46-47]. About one week later, on June 15, 2018, Ms. Bush again requested an FMLA accommodation, and Comcast responded by putting her on unpaid leave. [*Id.* at ¶ 48]. Then, on November 7, 2018, Comcast notified Ms. Bush that her employment would officially end effective November 14, 2018. [*Id.* at ¶ 50]. Ms. Bush exhausted her administrative remedies with the EEOC, and then filed this lawsuit on August 13, 2019. [*Id.* at ¶ 59].

Ms. Bush asserts claims of unlawful discrimination, failure to accommodate, hostile work environment, and retaliation under the ADA (Count 1), Title VII (Count 2), and the PHRA (Count 3).

## II. The Comcast Solutions program, and Comcast's motion to compel arbitration.

Comcast asserts that Ms. Bush accepted an arbitration agreement as a condition of her employment, and that her claims under the ADA, Title VII, and the PHRA fall within the scope of that agreement. According to Comcast, Ms. Bush received an offer letter before her first day of employment, sent digitally through Comcast's "Welcome Portal," which she accessed using a login and password unique to her. [ECF 9, p. 2]. The offer letter included a paragraph about Comcast's "Comcast Solutions" ADR program, which purports to require mandatory, binding arbitration of employment-related disputes. [ECF 7-2, pp. 29-30]. That paragraph stated:

**COMCAST SOLUTIONS**

Comcast has a dispute resolution program for its employees, known as Comcast Solutions, which provides a three-step process (facilitation, mediation and binding arbitration) for resolving a

- 4 -

variety of workplace legal issues should there be any that arise between you and the Company during or after your employment. A brochure with information and direction on how to obtain additional information related to the program is being provided to you along with this offer letter. Please review this information carefully, as the program affects the legal rights of both you and the Company (including a waiver of the right to bring a civil action in federal or state court or before a civil judge or jury, as well as a waiver of the right to bring or participate in a class action, collective action or representative action). If you cannot locate the brochure, have any questions or need additional information regarding Comcast Solutions, please call, toll free, 855-838-4180, or email to [address]. By accepting this offer of employment with the Company and signing below, you acknowledge that you understand the terms of the Comcast Solutions program and also acknowledge that both you and the Company agree to participate in and be bound by the terms of the Comcast Solutions program.

*See* [ECF 7-2, pp. 29-30; ECF 9, p. 3].

Comcast contends that Ms. Bush electronically signed her offer letter and checked a box stating "I Accept."  [ECF 26, pp. 2-3].  As referenced in the offer letter itself, below the link to the offer letter on Comcast's portal was a notice that stated, "Within your Offer Letter, you will find details about our Comcast Solutions program.  To learn more about the program, please click the link below to download and save a copy of the brochure for your records." [ECF 7-2, pp. 29, 32].  The brochure stated that "[b]y accepting employment with Comcast, you are agreeing that you and the company will be bound by the Comcast Solutions program for covered legal claims.  Upon returning your signed offer to the company, you will be automatically enrolled in Comcast Solutions."  [*Id.* at p. 42].  The brochure also urged Ms. Bush to "read the Comcast Solutions Guide, DRO rules, and FAQs to ensure you fully understand the Comcast Solutions program prior to accepting employment with the company."  [*Id.*].

Additionally, Comcast claims that, while employed by the company, Ms. Bush was required to acknowledge the Comcast Code of Conduct and Employee Handbook each year.  [ECF 9, p. 8].  The documents submitted by Comcast reflect that she did so twice, in 2017 and 2018.  [ECF 7-2, pp. 83-87].  The acknowledgement form required Ms. Bush to affirm that she "understand[s] that the Comcast Solutions Program is a mutually-binding contract between me and Comcast and that my continued employment with Comcast is confirmation that I am bound by the terms of the Comcast Solutions Program." [*Id.* at p. 83].  The document is about 1 ½ to 2 pages long.  [*Id.* at pp. 83-84].

In its motion, Comcast argues that "[b]y commencing employment with Comcast pursuant to the terms of the Offer Letter and twice confirming her participation in Comcast Solutions during her employment, Ms. Bush agreed to arbitrate her employment-related disputes with Comcast."  [ECF 9, p. 5].

## III.   Ms. Bush's declaration, and the parties' subsequent discovery.

In response to Comcast's motion, Ms. Bush submitted a declaration in which she stated: (1) "I do not recall receiving any documentation or information from Comcast concerning a mandatory arbitration program or an agreement to arbitrate," [ECF 12-1, ¶ 2]; (2) "I never entered into an arbitration agreement with Comcast and never agreed to arbitrate any claim I might have against Comcast," [*Id.* at ¶ 3]; (3) "During my employment, I was not made aware that I was, at any point in time, waiving any right to file a lawsuit in court against Comcast," [*Id.* at ¶ 4]; and (4) "From September 12, 2017 through June 2018, I repeatedly requested assistance from Comcast to deal with my coworkers' harassment.  Each request was denied by Comcast without an opportunity or offer to take part in any of the three dispute resolution steps offered through the Comcast Solutions Program and I was told

that all of my issues had to be dealt with by the human resources department in the Comcast Pittsburgh office." [*Id.* at ¶ 7].

Based on these statements, the Court authorized discovery into the limited issue of "whether [the parties] entered into the purported arbitration agreement." [ECF 15, p. 2]. After a subsequent status conference with the parties, the Court expanded the scope of discovery to include Ms. Bush's "material breach" argument, as well. [ECF 23, pp. 14:2-16:17].[1] The parties completed that discovery, including a deposition of Ms. Bush and exchange of relevant documents, before submitting supplemental briefing on Comcast's motion.

---

[1] As the Court explained in its previous Memorandum Order, discovery was appropriate in this matter because the question of whether Ms. Bush accepted the arbitration agreement was an inherently "fact-laden dispute" that required the Court "to venture beyond the four corners of the complaint." [ECF 15, p. 15]. The Third Circuit has instructed district courts to permit discovery in such circumstances, but that the discovery must be narrowly tailored to avoid frustrating the FAA's interest in speedy dispute resolution. *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 774 (3d Cir. 2013) ("Under either of those scenarios, a 'restricted inquiry into factual issues' will be necessary to properly evaluate whether there was a meeting of the minds on the agreement to arbitrate … and the non-movant 'must be given the opportunity to conduct limited discovery on the narrow issue concerning the validity' of the arbitration agreement[.]") (internal citations omitted).

For this same reason, the Court subsequently expanded the scope of discovery to include Ms. Bush's "material breach" argument—as it became clear, during a status conference with the parties, that a factual inquiry would be necessary to determine (1) whether Ms. Bush demanded that Comcast arbitrate a covered legal claim; and (2) whether Comcast refused. *See* [ECF 23, pp. 14:21-15:2] ("[I]t does seem like there could be a chance that there are some facts that need to be developed with respect to the Plaintiff's argument that Comcast materially breached or waived its rights under the Comcast Solutions program. It appears that Comcast would take the position that whatever communications that were made by Ms. Bush went more to this Comcast Listens program as opposed to [the] Comcast Solutions program.").

During her deposition, Ms. Bush admitted that she received an offer letter from Comcast, and testified that she had no "reason to dispute" that the offer letter she received was the same offer letter produced by Comcast with its motion to compel. [ECF 26-1, pp. 16:14-17:9, 18:19-23]. She also testified that she had no "reason to dispute" that she electronically accepted the terms of her employment outlined in the offer letter, including Comcast Solutions. [ECF 26-1, pp. 19:20-24]. Finally, Ms. Bush testified that she had no "reason to dispute" that she had twice acknowledged being bound by Comcast Solutions in February 2017 and March 2018. [ECF 26-1, pp. 30:6-32:19, Ex. 5, Ex. 6].

Separately, Ms. Bush also testified that, while employed, she never sought to assert any legal claim against Comcast through the Comcast Solutions program. [ECF 26-1 at p. 11:12-14]. Instead, she asked for Comcast's HR representative to mediate her dispute with her co-workers through a different program, "Comcast Listens," which permits employees to report workplace issues involving other employees. [*Id.* at pp. 10:6-16:5]. Bush obtained the contact information for Comcast Listens from a handbook that also contains separate contact information for Comcast Solutions. [*Id.* at pp. 25:22-27:19].

## STANDARD OF REVIEW

To decide whether to compel arbitration, the Court must first determine whether the alleged agreement is subject to the Federal Arbitration Act and then determine whether Ms. Bush's claims are arbitrable under that agreement. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 401 (1967); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). Employment contracts are subject to the FAA. *See Circuit City Store, Inc. v. Adams*, 532 U.S. 105, 119 (2001) ("[T]he text of § 1 precludes interpreting the exclusion provision to defeat the language of § 2 as to all

employment contracts.  Section 1 exempts from the FAA only contracts of employment of transportation workers."); *Hudyka v. Sunoco, Inc.*, 474 F. Supp. 2d 712, 715 (E.D. Pa. 2007) ("Agreements to arbitrate employment disputes, whether based on federal or state statutory claims, are enforceable under the Federal Arbitration Act[.]") (citations omitted).

When a motion to compel arbitration "is not based on a complaint with the requisite clarity to establish arbitrability or the opposing party has come forth with reliable evidence . . . that it did not intend to be bound by the arbitration agreement," the Court applies a Rule 56 summary-judgment standard to decide the motion.  *Sanford v. Bracewell & Guiliani, LLP*, 618 F. App'x 114, 117 (3d Cir. 2015) (cleaned up).  Based on Ms. Bush's declaration, the Court indicated its intent to apply a Rule 56 standard to decide Comcast's motion and allowed both parties to take limited discovery.  [ECF 15, p. 2].

To prevail under that standard, the moving party—here, Comcast—must show that "there is no genuine dispute as to any material fact" and that it is thus entitled to an order compelling arbitration "as a matter of law."  Fed. R. Civ. P. 56(a).  In deciding the motion, the Court must consider the evidence "in the light most favorable to the party opposing the motion."  *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).  Here, that is Ms. Bush.

## DISCUSSION & ANALYSIS

As noted at the outset, Ms. Bush makes three arguments to avoid enforcement of the alleged arbitration agreement.  For the following reasons, none are ultimately persuasive.

## I.   The arbitration agreement is not unconscionable.

It is well-established that agreements to arbitrate statutory discrimination claims in the context of an employment relationship—including claims under the ADA, Title VII, and the PHRA—are generally valid and

enforceable. *See Gilmer*, 500 U.S. at 26 ("It is by now clear that statutory claims may be the subject of an arbitration agreement[.]"); *see, e.g.*, *Seus v. John Nuveen & Co.*, 146 F.3d 175, 182 (3d Cir. 1998) (Title VII); *Zeller-Landau v. Sterne Agee CRT, LLC*, No. 17-3962, 2018 WL 334970, at *5 (E.D. Pa. Jan. 9, 2018) (Title VII & PHRA); *Maldonado v. SecTek, Inc.*, No. 19-693, 2019 WL 3759451, at *9 (E.D. Pa. Aug. 8, 2019) (ADA).

Moreover, in the case of ADA claims such as Ms. Bush's primary claim here, "the plain language of the ADA evinces Congress's intent to <u>encourage</u> arbitration, not to preclude it." *Maldonado*, No. 19-693, 2019 WL 3759451, at *9 (citations omitted) (emphasis original); *see also Stanton v. Prudential Ins. Co.*, No. 98-4989, 1999 WL 236603, at *5 (E.D. Pa. Apr. 20, 1999) ("The plain language of the statute evidences congressional intent to encourage arbitration of ADA claims, not to shield them from arbitration."). Specifically, the ADA provides: "Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under this chapter." 42 U.S.C. § 12212. "The meaning of this language, far from evidencing an intention to preclude arbitration, can only be interpreted as favoring it." *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 150 (1st Cir. 1998). And if this provision is to have effect, it must be "that litigants can anticipatorily waive a judicial forum for ADA claims." *Id.* (citation omitted).

Thus, like any agreement covered by the FAA, an agreement to arbitrate ADA or other federal employment-discrimination claims is subject to the "liberal federal policy favoring arbitration agreements[.]" *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) ("It is well

established that the Federal Arbitration Act . . . reflects a strong federal policy in favor of the resolution of disputes through arbitration.") (internals omitted).[2]

Even so, Ms. Bush argues that *this* arbitration agreement is both procedurally and substantively unconscionable. She says that the agreement is "procedurally unconscionable" because it is a "contract of adhesion drafted by Comcast and for the sole benefit of Comcast." [ECF 12, p. 8]. More specifically, she contends that she was "unaware of the terms of the alleged agreement," "had no ability to modify any of its terms," and "no opportunity to consult with counsel of her own." [*Id.* at pp. 8-9]. She also contends that "[n]o one from Comcast explained the Comcast Solutions program to [her], or what the terms of the Comcast Solutions Program meant." [*Id.* at p. 9]. As for substantive unconscionability, Ms. Bush argues that the Comcast Solutions program is "unreasonably or grossly favorable" to Comcast because it "contains a series of provisions that substantively benefit Comcast by limiting the rights and remedies that Bush would otherwise be entitled to in court," while "not provid[ing] Bush with any real benefit." [*Id.* at p. 9].

---

[2] Of course, this does not mean "that an arbitration agreement is enforceable no matter what rights it waives or what burdens it imposes." *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1482 (D.C. Cir. 1997) (citation omitted). For example, "it would be unlawful for an employer to condition employment on an employee's agreement to give up the right to be free from racial or gender discrimination." *Id.* (citation omitted). Similarly, "an employee cannot be required as a condition of employment to waive access to a neutral forum in which statutory employment discrimination claims may be heard." *Id.* Thus, "[a]t a minimum, statutory rights include both a substantive protection and access to a neutral forum in which to enforce those protections." *Id.* (citation omitted). As will be discussed here, the Comcast Solutions program provides adequate access to a neutral arbitrator and does not infringe Ms. Bush's substantive protections under any federal anti-discrimination statute.

The FAA "permits arbitration agreements to be declared unenforceable upon such grounds as exist at law or in equity for the revocation of any contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (cleaned up). Such grounds include "generally applicable contract defenses, such as fraud, duress, or unconscionability." *Id.* (cleaned up). The Court determines the applicability of these defenses with reference to Pennsylvania law. *See Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 522 (3d Cir. 2009) ("To determine whether the parties have agreed to arbitrate, we apply ordinary state-law principles that govern the formation of contracts.") (cleaned up).

Under Pennsylvania law, courts will find contracts to be unconscionable, and decline to enforce them, when there is "a lack of meaningful choice in the acceptance of the challenged provision and the provision unreasonably favors the party asserting it." *Salley v. Option One Mortgage*, 925 A.2d 115, 119 (Pa. 2007) (citation omitted). The party challenging the enforceability of a purported contract—here, Ms. Bush—bears the burden to show that *both* the procedural ("lack of meaningful choice") and substantive ("unreasonably favors") prongs of unconscionability are met. *Id.* at 120. The "ultimate determination of unconscionability is for the courts." *Id.* (citations omitted). But "where material facts are disputed . . . fact finding may be necessary." *Id.* (citations omitted); *see* RESTATEMENT (SECOND) OF CONTRACTS § 208, cmt. f ("[T]he determination is made 'as a matter of law,' but the parties are to be afforded an opportunity to present evidence as to commercial setting, purpose and effect to aid the court in its determination."); 13 Pa. C. S. § 2302 ("When it is claimed … that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence … to aid the court in making the determination.").

- 12 -

Ms. Bush first argues that the arbitration agreement here satisfies the "procedural" prong of the unconscionability analysis because it is a "contract of adhesion." An adhesion contract is a standardized contract, often offered on a "take-it-or-leave-it basis." *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 202 (3d Cir. 2010). The arbitration agreement here may certainly have been an adhesion contract, but that doesn't necessarily make it procedurally unconscionable. *See Salley*, 592 A.2d at 127 ("[M]erely because a contract is one of adhesion does not render it unconscionable and unenforceable as a matter of law.") (citations omitted). A more searching inquiry of the parties' respective bargaining positions, level of sophisticiation, and opportunity to review an arbitration agreement are all relevant considerations in determining whether the process was unfair. *See Seus*, 146 F.3d at 184 ("Unequal bargaining power is not alone enough to make an agreement to arbitrate a contract of adhesion."). The Court here, though, doesn't have to engage in this searching inquiry, because it's clear that Ms. Bush's argument fails on the second prong.

That is, the Comcast Solutions program is not substantively unconscionable. Ms. Bush argues that the program unfairly limits her right to seek remedies in court. But it doesn't—or at least she doesn't identify any specific way in which it does.

As a starting point, the Supreme Court has rejected the sort of "generalized attacks on arbitration" that "rest on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants." *Gilmer*, 500 U.S. at 30 (cleaned up). This includes speculation "that arbitration panels will be biased[,]" or concerns about matters such as the "more limited" discovery available in arbitration, the lack

of "written opinions" accompanying arbitration decisions, and "[m]ere inequality in bargaining power" between parties. *Id.* at 30-33.

Here, as noted, Ms. Bush offers only generalized concern that the Comcast Solutions program contains "a series of provisions" (which Ms. Bush does not identify) that "substantially benefit" Comcast by "limiting the rights and remedies that Bush would otherwise be entitled to in court." [ECF 12, p. 9]. If the agreement does contain such provisions, the Court cannot find them. Under the program:

- Preliminary steps of "review/facilitation" and "mediation" are "not a mandatory prerequisite before moving to arbitration," and either party may request to skip those steps.

- The arbitration provision of Comcast Solutions is binding on both Comcast and Ms. Bush. Either Comcast or an employee may initiate a claim by completing a "Comcast Solutions Initial Filing Form" or any "alternative document" identifying "the specific legal claims being pursued."

- When a dispute is initiated by either party, the parties will mutually select a "neutral arbitrator" through a specified dispute resolution organization. The organization is selected based on geography.

- The arbitration is to be held "as soon as possible" and "at a location that is as convenient to the employee's work location . . . as practicable[.]" The employee is excused from absences on the day(s) of the arbitration and will receive regular pay.

- Just as in court, employees may be represented in the arbitration by attorneys of their choice. As in court, this is at their own cost. But Comcast will also reimburse the employee for $1,500 in attorneys' fees, unless the claim is determined by the arbitrator to be frivolous.

- Comcast covers the full cost of arbitration, except for an $150 "initiation fee," which the initiating party is required to pay. The selected arbitrator will not be told that Comcast is covering the majority of arbitration costs. The $150 fee will be reimbursed by Comcast if the arbitrator "ultimately awards in the Participating Employee's favor, in whole or in part[.]"

- ▪ The arbitrator will "apply applicable federal, state[,] or local law in assessing the merits of the Claim(s) and will determine the rules of evidence." The parties will be permitted to submit post-hearing briefing, and the arbitrator will issue a written opinion.

- ▪ The arbitrator is "authorized to award any damages, attorney's fees[,] or equitable relief that would be available through a court" except for "class or collective relief."

- ▪ The arbitrator's decision is "final and binding" and "may be enforced by a court."

- ▪ Comcast "strictly prohibits retaliation" against any employee who submits a claim or participates as a witness in good faith.

[ECF 7-2, pp. 52-56].

On its face, Comcast Solutions appears to establish a fair, neutral arbitration process that applies equally to Comcast and does not impose undue costs or burdens (beyond those that would be attendant to any litigation) on complaining employees. Nor does the arbitration provision purport to limit Ms. Bush's statutory rights. *See Cole*, 105 F.3d at 1482 (explaining that, while employer-employee arbitration agreements are enforceable, "it would be unlawful for an employer to condition employment on an employee's agreement to give up the right to be free from racial or gender discrimination.") (citation omitted).

In fact, the selected arbitrator is directed to "apply applicable federal, state[,] or local law," and is empowered to issue a binding award of "any damages, attorney's fees[,] or equitable relief that would be available through a court." [ECF 7-2, pp. 54]. The lone exception is an exclusion of any "class or collective relief," which Ms. Bush does not seek and which the Supreme Court has held may be a permissible limitation under certain conditions. *See Gilmer*, 500 U.S. at 32; *Underwood v. Chef Fransico/Heinz*, 200 F. Supp. 2d 475, 480 (E.D. Pa. 2002) ("The *Gilmer* Court further ruled that the inability of plaintiff to obtain broad equitable relief through the use of a class action did not make

the arbitral forum insufficient to press his claims of age discrimination.") (citation omitted).[3]

This is a fair arbitration procedure. Indeed, several other district courts have specifically considered the Comcast Solutions program and found it to be enforceable. *See, e.g. Azeveda v. Comcast Cable Commc'ns LLC,* No. 19-1225, 2019 WL 5102607, at *7 (N.D. Cal. Oct. 11, 2019) ("Plaintiff misunderstands the standard. Through his electronic acknowledgment, he did expressly consent to the Program and agreed to the updated arbitration provisions. . . . Accordingly, Plaintiff is bound by the [Comcast Solutions] Program."); *Lancaster v. Comcast Commc'ns Mgmt. LLC,* No. 16-14446, 2017 WL 3616494, at *5 (E.D. Mich. Aug. 23, 2017); *Garcia v. Comcast Cable Commc'ns Mgmt. LLC,* No. 16-2975, 2017 WL 1210044, at *2 (N.D. Cal. Mar. 31, 2017); *Whitehead v. Comcast Corporation,* No. 15-2548, 2015 WL 13744598, at *4 (W.D. Tenn. Dec. 14, 2015).

In any event, Ms. Bush has failed to cite or identify any of the "series of provisions" that she believes unduly favor Comcast. If such provisions do exist, it was her burden to direct them to the Court's attention and explain why they are unsconsionable. *See DeShields v. Int'l Resort Props. Ltd.*, 463 F. App'x 117, 120 (3d Cir. 2012) ("If factual support for DeShields's claim existed in the record, it was incumbent upon her to direct the District Court's attention to those facts."); *Bernard v. Webb-McRae, et al.*, No. 17-7030, 2020 WL 1329934, at *2 (D.N.J. Mar. 23, 2020) ("It is not the Court's responsibility to sift through the record in order to make Plaintiff's arguments for him.") (citation omitted).

In conclusion, the purported arbitration agreement is not substantively unconscionable because it does not favor either party, hinder either party's

---

[3] Because Ms. Bush does not assert any class-action claims, the Court makes no finding on whether this particular limitation is enforceable.

substantive rights, or limit remedies unfairly. Thus, while Comcast Solutions may well be a "contract of adhesion," it is not unconscionable or otherwise unenforceable under Pennsylvania law. *See Salley*, 592 A.2d at 127.

## II. Ms Bush manifested an intent to be bound by the Comcast Solutions arbitration agreement.

Having determined that Comcast Solutions is not unconscionable, the next question is whether Ms. Bush agreed to it. Ms. Bush argues that her online acceptances of the offer letter and annual policy acknowledgments were not effective manifestations of intent to be bound by the program. The Court disagrees.

"The first element of the test for enforceability of a contract is whether both parties manifested an intention to be bound." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009) (citations omitted). To assess the intent of parties to make a contract, a court looks not to their inward, subjective intent but to "the intent a reasonable person would apprehend in considering the parties' behavior." *Id.* (citation omitted). Thus, "a true and actual meeting of the minds is not necessary to form a contract." *Id.* (citation omitted). Objective manifestations of intent control.

"To form an enforceable contract, there must be an offer, acceptance and consideration." *Hudyka*, 474 F. Supp. 2d at 716 (citation omitted). Of relevance here, "[w]ithout knowing the terms of the contract, one cannot accept them." *Id.* (citation omitted). "Therefore, an employee cannot validly agree to arbitrate his claims unless he has been advised of the arbitration terms." *Id.*; *see also Watson v. ScotlandYard Sec. Servs., Ltd.*, No. 12-1156, 2013 WL 5676771, at *2 (W.D. Pa. Oct. 18, 2013) (Bissoon, J.) ("Plaintiffs Watson and Moon cannot have entered into a valid contract with ScotlandYard if they had

never actually received the employee manual that contained the arbitration policy.").[4]

Ms. Bush admitted during her deposition—and Comcast has submitted extrinsic evidence to establish—that she did, in fact, acknowledge and accept the arbitration policy through Comcast's online "Welcome Portal." [ECF 26-1, pp. 30:2-32:19, Ex. 5; ECF 7-2, pp. 29-30]. She did so both when she accepted her offer letter and again, twice, when she annually acknowledged her understanding "that the Comcast Solutions Program is a mutually-binding contract between me and Comcast and that my continued employment with Comcast is confirmation that I am bound by the terms of the Comcast Solutions Program." [ECF 7-2, pp. 83-87; ECF 26-1, pp. 30:2-32:19]. To the extent Ms. Bush still relies on her earlier declaration to suggest otherwise, her subsequent deposition testimony controls. *See In re CitX Corp., Inc.*, 448 F.3d 672, 679 (3d Cir. 2006) ("We perceive no principle that cabins sham affidavits to a particular sequence. … [C]ross-examining the affiant in a later deposition seems the better way to find the flaws in a bogus affidavit.").

Click-based web agreements of this kind are "routinely enforced by the courts." *HealthplanCRM, LLC v. AvMed, Inc.*, ___ F. Supp. 3d ___, No. 19-1357, 2020 WL 2028261, at *18 (W.D. Pa. Apr. 28, 2020) (Ranjan, J.). And both

---

[4] *See also Quiles v. Fin. Exch. Co.*, 879 A.2d 281, 286 (Pa. Super. Ct. 2005) ("Without receipt or delivery of the Handbook which was the only document containing the relevant arbitration provisions, Quiles was unable to knowingly and voluntarily waive all other means of dispute resolution.") (citation omitted); *Carfagno v. Ace, Ltd.*, No. 04-6184, 2005 WL 1523530, at *10 (D.N.J. June 28, 2005) ("[T]he employment application clearly informed each employee that the detailed policies were available to each applicant for inspection. … Plaintiffs adduced no evidence that they were denied access to the detailed arbitration policy or that they did not understand the arbitration policy.") (internal citations omitted).

acceptances were enough to place Ms. Bush on notice of the Comcast Solutions program and its key terms.  The offer letter that Ms. Bush "acknowledged" and e-signed stated that "[b]y accepting this offer of employment with the Company and signing below, you acknowledge that you understand the terms of the Comcast Solutions program and also acknowledge that both you and the Company **agree to participate in and be bound by the terms of the Comcast Solutions program**."  [ECF 7-2, p. 29] (emphasis added).  More importantly, the same offer letter advised Ms. Bush of the primary consequence of giving her assent:

> Comcast has a dispute resolution program for its employees, known as Comcast Solutions, which provides a three-step process (facilitation, mediation **and binding arbitration**) for resolving a variety of workplace legal issues should there be any that arise between you and the Company during or after your employment. A brochure with information and direction on how to obtain additional information related to the program is being provided to you along with this offer letter. Please review this information carefully, as the program affects the legal rights of both you and the Company (**including a waiver of the right to bring a civil action in federal or state court or before a civil judge or jury, as well as a waiver of the right to bring or participate in a class action, collective action or representative action**).

[*Id.*] (emphasis added).

Located below the link to Ms. Bush's offer letter on Comcast's portal was a notice that "[w]ithin your Offer Letter, you will find details about our Comcast Solutions program.  To learn more about the program, please click the link below to download and save a copy of the brochure for your records." [*Id.* at p. 32].  The linked brochure included a thorough explanation of the Comcast Solutions program that, once again, warned Ms. Bush that she would "waive the right to a civil action or a jury trial for any covered claims" and

explained that both Ms. Bush and Comcast would be "bound by the final decision of the arbitrator." [*Id.* at p. 42]. The brochure then urged Ms. Bush to "read the Comcast Solutions Guide, DRO rules, and FAQs to ensure you fully understand the Comcast Solutions program prior to accepting employment with the company." [*Id.*]. A FAQ in the brochure identified "allegations of unlawful discrimination or harassment based on a protected category" as falling within the Comcast Solutions program. [*Id. at* p. 43].

Other courts in this Circuit have held that the acknowledgement of language such as this is sufficient to create a binding arbitration agreement. *See, e.g.*, *Oliver v. Nordstrom King of Prussia*, No. 10-5340, 2010 WL 5121966, at *2 (E.D. Pa. Dec. 14, 2010) (holding a new employee's signature on the employment policy stating, "[m]y signature below acknowledges that I am aware of and agree to abide by the Company's Dispute Resolution Program" created enforceable contract); *JPMorgan Chase & Co. v. Custer*, No. 15-6288, 2016 WL 927339, at *1 (D.N.J. Mar. 10, 2016) (enforcing acknowledgement that by "signing below I acknowledge and agree that I have read and understand the Binding Arbitration Agreement, have accepted its terms and understand that it is a condition of my employment with JPMorgan Chase").

This is also not a case in which Ms. Bush did not have access to a copy of the arbitration policy—her offer letter was accompanied by a prominent link to the detailed Comcast Solutions brochure. *Compare to Hudyka*, 474 F. Supp. 2d at 716-718 (holding no arbitration agreement formed where employee did not receive email that referenced the policy, employer could not show that the employee ever had access to the terms of the agreement, and the agreement itself was ambiguous because it stated only that either party "can request arbitration" and the "employee has the option to proceed to . . . [a]rbitration"); *see also Quiles*, 879 A.2d at 283; *Watson*, 2013 WL 5676771, at * 2.

Ms. Bush argues that, even if she agreed to *something*, the terms of that agreement are "not sufficiently definite to be enforced" because "to get a full grasp of the Comcast Solutions program, one must review five separate documents: the Employee Handbook, Comcast Solutions Brochure, Comcast Solutions Program Guide, Comcast Solutions Frequently Asked Questions, and Comcast new Hire Guide." [ECF 27, p. 3]. She also argues that "even after all these documents are reviewed it is still not clear what claims are covered under Comcast Solutions[.]" [*Id*.].

The Court disagrees, at least as it relates to Ms. Bush's claims here. Whether or not that characterization would be true as to certain edge cases, it is clear, and was made reasonably clear to Ms. Bush, that the Comcast Solutions program covers discrimination claims of the kind at-issue here. Indeed, the materials Comcast provided Ms. Bush, or directed her to, said so explicitly.

Ms. Bush's claim that she was reasonably unaware of having agreed to forego her right to file a lawsuit is particularly unconvincing. That aspect of Comcast Solutions was clear from her offer letter itself, which warned her that she should review the terms of the program carefully because they "include[ed] a waiver of the right to bring a civil action in federal or state court or before a civil judge or jury, as well as a waiver of the right to bring or participate in a class action, collective action or representative action." [ECF 7-2, p. 29].

Thus, to be fully aware of the relevant terms of the Comcast Solutions program, and certainly to be aware that she was waiving her right to bring a lawsuit of this kind, Ms. Bush only needed to review her offer letter (which advised her that she would be giving up her rights to file a lawsuit) and the brochure that the offer letter linked to and cautioned her to review (which clarified that discrimination claims were covered by the program). Ms. Bush

then acknowledged, twice, that she was bound by the Comcast Solutions program during her tenure with Comcast.

Given these facts, the Court finds that Ms. Bush objectively manifested an intent to be bound by the Comcast Solutions program when she accepted the terms of her offer letter and then reaffirmed her acceptance of those terms each year of her employment.

## III.   Comcast did not materially breach the arbitration agreement.

Finally, Ms. Bush contends that Comcast materially breached its own obligations under the Comcast Solutions program by failing to "provide [her with] a process through which claims can be raised and resolved in a prompt and efficient manner." [ECF 27, p. 4]. According to Ms. Bush, this "material breach" voided the arbitration agreement and now excuses her from complying with its terms.

Ms. Bush is correct that a material breach that goes directly to the essence of a contract generally excuses the non-breaching party from continuing its duties under the contract. *See LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 652 (Pa. 2009). And, in this context, the Court agrees that an employer "cannot compel [a plaintiff] to honor an arbitration agreement of which it is itself in material breach." *Nadeau v. Equity Residential Properties Mgmt. Corp.*, 251 F. Supp. 3d 637, 642 (S.D.N.Y. 2017) (cleaned up). In other words, "when an employer enters into an arbitration agreement with its employees, it must itself participate in properly initiated arbitration proceedings or forego its right to compel arbitration." *Id.* (cleaned up). To hold otherwise "would set up a perverse incentive scheme. Employers . . . would have an incentive to refuse to arbitrate claims brought by employees in the hope that the frustrated employees would simply abandon them." *Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1012 (9th Cir. 2005).

Thus, Ms. Bush is right when she argues that Comcast Solutions is, and must be, a two-way street.  If an employee demands to arbitrate, Comcast must either do so or risk forfeiting its right to compel arbitration when the employee later sues.  But Comcast did not breach the arbitration agreement here because Ms. Bush did not make any demand that would trigger the Comcast Solutions program.

To be clear, in reaching that conclusion, the Court puts little weight on the formal distinction between the Comcast Listens and Comcast Solutions programs that Comcast urges the Court to adopt.  "Arbitration demands are not subject to formalistic requirements, nor are they comparable to pleadings in federal court." *Nadeau*, 251 F. Supp. 3d at 642.  If Ms. Bush had demanded to mediate or arbitrate a potentially covered legal claim against Comcast, it would be Comcast's responsibility to recognize that the demand should have been directed to the Comcast Solutions program and refer her in that direction.

But during her deposition, Ms. Bush testified that she did not demand to mediate or arbitrate any claim against Comcast.  Rather, she asked Comcast (through Comcast Listens) to facilitate a discussion between herself and the employees she alleged were harassing her, in an effort to resolve those issues.  On this distinction, her testimony was clear:

> Q: Sure. I'm asking why you believe that Comcast breached the arbitration agreement?
>
> A: Because they didn't assist when I asked them to, according to what they stated.
>
> Q: What they stated where?
>
> A: In the handbook.
>
> Q: Are you specifically referring to any portion of the handbook?

A: I can't quote it, per se, but I do know when we have a complaint, when we file a complaint, there's a certain process we go through.

Q: Are you talking about filing a complaint with Comcast Listens or Comcast Solutions?

A: Listens.

. . .

Q: So I want to talk specifically about your request for mediation.  You said you made multiple requests.  So you made multiple requests for mediation to the four people that you referenced; is that right?

A: Yes.

Q: All of those requests for mediation related to a request that you sit down with the young ladies, as you put it; is that right?

A: Yes.

. . .

Q: So just to be perfectly clear, you made multiple mediation requests.  Every request was for an opportunity to sit down with Ms. Johnston, Ms. Dietz, and Ms. Bradley to discuss various issues; is that fair?

A: Yes.

. . .

Q: Did you make any other requests for mediation, than those we have already discussed?

A: No.

Q: Was it your understanding that human resources would facilitate that mediation with those three individuals?

A: Yes.

Q: Were you ever offered an opportunity to meet with any of those individuals?

A: Yes.

Q: With whom?

A: Kimberly Johnston.

Q: Did you meet with Ms. Johnston?

A: No.

Q: Why not?

A: After speaking with my therapist and the (inaudible) ones of the situation, it was advised that – no longer to interact with her.

[ECF 26-1, pp. 10:6-16:5].

Given this testimony, the Court sees no indication that Ms. Bush ever made a request to resolve a legal claim against Comcast that was rebuffed. Ms. Bush has otherwise offered no evidence that she specifically made a demand to mediate or arbitrate any claims as against Comcast. And while Comcast's alleged failure to investigate or address the conduct of Ms. Bush's co-workers may well be evidence to support Ms. Bush's discrimination or hostile work environment claims, it was not a breach of the arbitration agreement.[5]

Finally, Ms. Bush argues that Comcast breached its obligations under the Comcast Solutions program merely by failing to protect Ms. Bush from harassment or discrimination, presumably by invoking the arbitration program against itself. [ECF 12, p. 4-5; ECF 27, p. 3-4]. This argument is unpersuasive, as Ms. Bush is "essentially bootstrapping the conduct for which [she] is suing [Comcast] into a separate reason for voiding the arbitration clause." *W. Hosps. Fed. Credit Union v. E.F. Hutton & Co.*, 700 F. Supp. 1039, 1042 (N.D. Cal. 1988). If such an argument were permissible, courts could not

---

[5] While Ms. Bush testified during her deposition that she initially "thought Comcast Listens and Comcast Solutions were the same thing," [ECF 26-1, pp. 11:15-18], this is besides the point. The focus of the inquiry is on *Comcast*, and whether it breached its obligations—*i.e.*, whether Comcast was ever presented with a demand to arbitrate a legal claim against it and refused. Because Ms. Bush never demanded arbitration of any claim against Comcast, Comcast did not breach its contract, regardless of whether Ms. Bush understood the formal distinction between Comcast Listens and Comcast Solutions.

compel arbitration in any discrimination case in which the employer does not recognize that it violated the law and offer to refer the matter to arbitration. As detailed above, that is not what courts have done.

As a result, the Court finds that Comcast did not materially breach the arbitration agreement, and so Ms. Bush must still abide by her own obligations under that agreement.

## **CONCLUSION**

For all the reasons discussed above, the Court will grant Comcast's motion and compel Ms. Bush to arbitrate her claims.  The Court will then dismiss, rather than stay, this case as all Ms. Bush's claims are arbitrable and neither party has requested a stay. *See Somerset Consulting, LLC v. United Capital Lenders, LLC*, 832 F. Supp. 2d 474, 490 (E.D. Pa. 2011) ("[N]either plaintiffs nor defendants have requested that we stay the action pending arbitration. We will accordingly dismiss plaintiffs' amended complaint and close this case."); *Alford v. Dean Witter Reynolds, Inc.,* 975 F.2d 1161, 1164 (5th Cir. 1992) ("The weight of authority clearly supports dismissal of the case when *all* of the issues raised in the district court must be submitted to arbitration.") (citations omitted).

DATE: July 22, 2020                    BY THE COURT:

                    /s/ *J. Nicholas Ranjan*
                    United States District Judge